Of Counsel:

DAMON KEY LEONG KUPCHAK HASTERT
Attorneys at Law, A Law Corporation

GREGORY W. KUGLE          6502-0
gwk@hawaiilawyer.com
ROSS UEHARA-TILTON      10743-0
rut@hawaiilawyer.com
DAVID H. ABITBOL          11635-0
dha@hawaiilawyer.com
1003 Bishop Street, Suite 1600
Honolulu, Hawaii 96813
www.hawaiilawyer.com
Telephone: (808) 531-8031
Facsimile:  (808) 533-2242

Attorneys for Plaintiffs

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| MAKAI RANCH, LLC, a Hawaii limited liability company; MARCONI FARMS, LLC, a Hawaii limited liability company; MP UNIT 21, LLC, a Hawaii limited liability company; and RCA TRADE CENTER INC., a Hawaii corporation;<br><br>          Plaintiffs,<br><br>     vs.<br><br>CITY & COUNTY OF HONOLULU; DAWN TAKEUCHI APUNA, in her Official Capacity as Director of the Department of Planning and Permitting; and DOES 1–10,<br><br>          Defendants. | Case No. 1:23-cv-00230-JAO-WRP |

## SECOND AMENDED COMPLAINT
## FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiffs MAKAI RANCH, LLC, a Hawaii limited liability company

("**Makai Ranch**"), MARCONI FARMS, LLC, a Hawaii limited liability company

("**Marconi Farms**"), MP UNIT 21, LLC, a Hawaii limited liability company ("**MP**

**Unit 21**"), and RCA TRADE CENTER INC., a Hawaii corporation ("**RCA Trade**

**Center**," and collectively with Makai Ranch, Marconi Farms, and MP Unit 21,

"**Plaintiffs**"), by and through their attorneys, DAMON KEY LEONG KUPCHAK

HASTERT, and pursuant to the *Order Granting in Part and Denying in Part*

*Defendants' Motion to Dismiss* filed December 20, 2023 (ECF No. 37), for their

First Amended Complaint against Defendants CITY AND COUNTY OF

HONOLULU ("**City**"), DAWN TAKEUCHI APUNA, in her Official Capacity as

Director of the Department of Planning and Permitting ("**Director Apuna**"), and

DOES 1–10 (collectively with City and Director Apuna, "**Defendants**"), allege and

aver as follows:

## INTRODUCTION

1.      Beginning over ten years ago, Defendants gave official

assurances to Plaintiffs and their predecessors-in-interest that a Special Management

Area Permit ("**SMA Permit**") was not needed for certain preparations and

improvements—such as agricultural infrastructure preparations, farm dwellings, and

other permitted uses—on Plaintiffs' properties, because these preparations and

improvements are not considered "development" under the Coastal Zone Management Act.

2.      However, since giving these assurances, the City and its Department of Planning and Permitting ("**DPP**") have engaged in unlawful and systematic actions to delay and ultimately prevent Plaintiffs from proceeding with their plans to improve and use the properties as intended.

3.      Acting in concert, the Defendants have violated Plaintiffs' constitutional rights by, on one hand, preventing Plaintiffs from using their property for lawful agricultural purposes. In so doing, Defendants have infringed upon Plaintiffs' constitutional rights to due process and equal protection, and have effected an unconstitutional regulatory taking of Plaintiffs' property rights.

**PARTIES**

**PLAINTIFFS**

4.      Plaintiff Makai Ranch was organized on March 3, 2009 as a Nevada limited liability company. Effective July 18, 2019, Makai Ranch converted from a Nevada limited liability company to a Texas limited liability company in accordance with the laws of the State of Nevada and the State of Texas. Effective July 19, 2019, Makai Ranch underwent a divisional merger in accordance with Texas law, which resulted in the creation of five new entities: (1) Plaintiff Marconi Farms,

(2) Plaintiff MP Unit 21, (3) MARCONI STATION, LLC, (4) MP UNIT 16, LLC, and (5) MP UNIT 20, LLC. Makai Ranch itself also survived this divisional merger.

5.      Effective February 22, 2024, Makai Ranch and MP Unit 21 converted to Hawaii limited liability companies. Effective March 25, 2024, Marconi Farms converted to a Hawaii limited liability company.

6.      JEREMIAH A. HENDERSON, III (“**Henderson**”), through a series of trusts and other intermediary entities, is the ultimate beneficial owner of Makai Ranch.

7.      Plaintiff RCA Trade Center was incorporated as a Hawaii corporation on August 15, 2019. Henderson is the ultimate beneficial owner of RCA Trade Center.

8.      Effective October 7, 2020, Plaintiff RCA Trade Center merged with MP UNIT 20, LLC (one of the entities created through the divisional merger of Makai Ranch). RCA Trade Center survived the merger.

9.      Thus, Plaintiffs Marconi Farms, MP Unit 21, and RCA Trade Center are all successors-in-interest to Makai Ranch and are all beneficially owned by Henderson.

**DEFENDANTS**

10.      Defendant City is a municipal corporation of the State of Hawaii and is generally charged with municipal governance on the Island of Oahu. As

relevant to this case, Defendant City is acting primarily through its agency, DPP, which is charged with the planning and permitting of improvements, and the enforcement of zoning regulations adopted by the City, on the Island of Oahu.

11.     Defendant Director Apuna is the Director of DPP and, in performing her duties is and was at all relevant times acting under color of law. Director Apuna is being sued only in her official capacity. Director Apuna has served as Acting Director of DPP since September 16, 2022, and was confirmed as Director of DPP on February 22, 2023.

## JURISDICTION AND VENUE

12.     This is a civil action arising under the United States Constitution and this Court has original subject matter jurisdiction over this proceeding under 28 U.S.C. § 1331 and 42 U.S.C. § 1983. This Court also has supplemental subject matter jurisdiction over this proceeding under 28 U.S.C. § 1367.

13.     Venue is proper in this Court because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in the District of Hawaii, and because the property that is the subject of this action is located in the District of Hawaii.

## FACTS COMMON TO ALL COUNTS

## THE PROPERTY

14.     Plaintiff Makai Ranch is the developer of Marconi Point Condominiums ("**Project**"), an agricultural condominium property regime established by the Declaration of Condominium Property Regime of Marconi Point Condominiums filed in the Bureau of Conveyances of the State of Hawaii on December 16, 2013 as Document No. A-50980843 (as amended, "**Declaration**"). The Project is located at 56-1089 Kamehameha Highway, Kahuku, Hawaii 96731, the real property identified by Master Tax Map Key ("**TMK**") (1) 5-6-003-053 (and additional Tax Map Key Numbers for each condominium unit).

15.     In 2005, MARCONI POINT, LLC, which was owned by CONTINENTAL PACIFIC, LLC, purchased 97 acres bordering the Turtle Bay Resort and other parcels for over $20.5 million, with the intent to subdivide the property, from AINA NUI CORPORATION, an affiliate of the JAMES CAMPBELL COMPANY. In 2009, MARCONI POINT, LLC merged into Makai Ranch.

16.     The original property consisted of four (4) separate underlying zoning lots: Lot 160-B (73.993 acres), Lot E (20.52 acres), Exclusion 23 (0.275 acre), and Exclusion 24 (0.239 acre).

17.     The Project is made up of three of the four original zoning lots: Lot 160-B, Lot E, and Exclusion 23.  The three lots consist of Lot 160-B (73.993 acres); Lot E (20.52 acres), and Exclusion 23 (0.275 acres). The Project also consists of various other fee simple lots and easement rights, forming portions of Marconi Road and other roadways that serve the Project and adjacent properties. These are Lot 25 (0.018 acre), Lot F-1 (0.822 acre), and Lot F-2 (0.009 acre). Lot 160-B, Lot E, Exclusion 23, Lot 25, Lot F-1, and Lot F-2 are referred to collectively as the "**Property**."

18.     The Property borders the ocean to the North with over 3,000 linear feet of shoreline, on what is known as Hanakaʻilio Beach. The Turtle Bay Resort's golf course is located to the West of the Property, separated from the Property by Lot 17 of the Turtle Bay Bulk Lot Subdivision, a parcel presently managed by the North Shore Community Land Trust and proposed to be dedicated to the City as a public park. The James Campbell Wildlife Refuge is located to the South and Southeast, and other private parties own land to the East.

19.     Since purchasing the Property in 2005, Makai Ranch has intended to subdivide the Property and to use the Property for agricultural and other activities permitted without the need to apply for an SMA Permit. Makai Ranch initially hired the R. M. Towill Corporation as its consultant to process the subdivision application(s).

20.    Makai Ranch nominated the Property, and the Property has been listed, in the National Register of Historic Places. The Property is also listed on the Hawaii Register of Historic Places. It is the site of the former Marconi Wireless Telegraph Station, which, at the time of its opening in 1913, was the largest wireless telegraph station in the world in terms of capacity and power. The Station complex consisted of four buildings that are still partially standing today—a powerhouse/operating building, a hotel, an administration building, and a manager's residence. The hotel housed fifteen rooms, a reading room, a club room, a library, a dining room, and a kitchen. From 1941, the Property was also the site of the Kahuku Airfield Military Reservation, with two paved runways, a control tower, enlisted barracks for over 200 servicemen, officer's quarters, mess halls, dispensaries, two fire stations, a chapel, and post office. The hotel became the base headquarters, the administration building housed base operations, and the manager's residence became the commanding officer's quarters. Following the war, the property was returned to the Radio Corporation of America (RCA) and continued telegraphic and telephone communication service until 1978. Additional uses during RCA's ownership included the Kahuku Drag Strip, which opened in 1948 and operated until around 1964. According to reports, crowds of 3,000 to 5,000 people gathered to watch the drag races during that time. In 1972, the State Land Use Commission issued a permit authorizing construction of an amusement park, to be called

Alohaland, with 1.2 million annual projected visitors, although the amusement park never came to fruition.

21.    As the developer of the Project, Makai Ranch formerly owned each of the 32 condominium units ("**Units**") comprising the Project. At various times Makai Ranch has sold some of the Units to unrelated third parties, and at other times has conveyed other Units to affiliated entities, including without limitation Plaintiffs Marconi Farms, MP Unit 21, and RCA Trade Center.

22.    The Property is mostly designated Agricultural by the State Land Use Commission ("**LUC**") and zoned General Agricultural (AG-2) under the City & County of Honolulu's Land Use Ordinance ("**LUO**"). In addition, certain portions of the Property adjacent to the shoreline are designated Conservation by the LUC and zoned Preservation (P-1) under the LUO.

23.    At the time of Plaintiffs' original complaint, Makai Ranch owned Unit 32 of the Project, identified by TMK No. (1) 5-6-003-053-0032. Under prior versions of the Declaration, the current Unit 32 was designated as Unit 26.

24.    At the time of Plaintiffs' original complaint, Plaintiff Marconi Farms owned Units 2 through 4, 6, and 28, 29, and 31 of the Project, identified by TMK Nos. (1) 5-6-003-053-0002 through -0004, -0006, -0028, -0029, and -0031. Under prior versions of the Declaration, the current Units 28 through 31 of the

Project were identified as Units 22 through 25. Marconi Farms currently owns Unit 29 of the Project.

25.     Plaintiff RCA Trade Center owns Units 20 through 23 of the Project, identified by TMK Nos. (1) 5-6-003-053-0020 through 23. Under prior versions of the Declaration, the current Units 20 through 23 of the Project consisted of a single Unit, then identified as Unit 20.

26.     Plaintiff MP Unit 21 is the successor-by-merger to Makai Ranch and is the owner of Units 24 through 27 of the Project, identified by TMK Nos. (1) 5-6-003-053-0024 through 27. Under prior versions of the Declaration, the current Units 24 through 27 of the Project consisted of a single Unit, then identified as Unit 21.

27.     As the developer of the Project, Makai Ranch also controls and owns some of the underlying lots, which are common elements of the Project until such common elements are conveyed to the ASSOCIATION OF UNIT OWNERS OF MARCONI POINT CONDOMINIUMS ("**Association**").

**PLAINTIFFS' DEVELOPMENT-BACKED EXPECTATIONS**

28.     It is and has been Makai Ranch's intention to put the Property to productive and sustainable agricultural use, implement conservation practices, pursue clean energy production, bring non-conforming infrastructure into conformance, and preserve and restore the historic buildings of the former Marconi

Wireless Telegraphy Station (the "**Permitted Uses**"). Makai Ranch has gone to great lengths to prepare the Property for these Permitted Uses. Out of respect for the cultural and historical significance of the area, Makai Ranch has meticulously researched the history of the Property, met with community leaders and stakeholders, and conducted numerous design and other studies, all at significant expense.

29.    Specifically, Makai Ranch has:

A.    Conducted a Flora & Fauna Resource Assessment in 2008, and additional Flora & Fauna Resource surveys in 2013 and 2021;

B.    In 2011, secured significant debt financing for anticipated design, permitting, and site-preparation work, and eventually for the installation of infrastructure and other improvements;

C.    Conducted a Biological Resource Survey in 2012;

D.    Obtained an approved Soil and Water Conservation Plan in 2012 from the Windward Oahu Soil and Water Conservation District;

E.    Nominated and obtained approval in 2012 for the historic structures to be placed on both the National and State Registers of Historic Places;

F.    Obtained an approved Archaeological Inventory Survey in 2013, obtained an approved Archaeological Monitoring Plan in 2018, and a

Memorandum of Agreement in 2021 from the State Historic Preservation Division of the Hawaii Department of Land and Natural Resources;

        G.    Cleared the Property of invasive flora species and overgrowth, and restored and regenerated native species;

        H.    Constructed and installed agricultural infrastructure, including roadways and electrical and other utility facilities within the boundaries of the Project;

        I.    Constructed agricultural warehouses, one of which is fully complete and occupied;[1] and

        J.    Completed initial design and site preparation work and ordered materials for the construction of seven (7) additional agricultural warehouses, which are currently under construction;

        K.    Entered into agreements for the development and installation of two (2), 500kw rooftop photovoltaic electricity generating facilities;

---

[1] Although construction of the first building is complete, as explained in further detail below, Defendants have refused to issue a building permit covering improvements to the interior of the building. In 2019, the City enacted Bill 24, which provides for "Special Assignment Inspections." Bill 24 codified DPP's previous practice of allowing "courtesy inspections," which would permit commercial construction to proceed before issuance of a building permit if certain conditions were met. Thus, the interior construction of the first building is already complete but cannot be "closed out" until the building permit is issued.

L.    Undertaken significant financing and other activities related to the foregoing.

M.    Removed abandoned cars, trash, and other rubbish from the property.

N.    Surveyed and marked the approximate location of the State Land Use District Boundary on the ground.

O.    Cooperated with the U. S. Fish & Wildlife Service and North Shore Community Land Trust to protect the Albatross and Yellow Faced Bee habitats on the Property, as well as completing Phase I and Phase II Environmental Site Assessments.

30.    In addition to the above activities, Makai Ranch has been required to obtain significant debt financing. When the Property was purchased in 2005, it was paid for in cash and $6.5 million in debt, which was paid in full by 2008. By 2011, Makai Ranch had to secure private debt financing for anticipated further design and permitting work, which was taking longer and was more costly than initially anticipated. Since 2011:

A.    Costs continued to mount, and after multiple extensions and refinancing of the original loan, Makai Ranch was able to obtain a federally-guaranteed loan through a U.S. Department of Agriculture loan program for Unit 20 (now owned by RCA Trade Center and the Unit on which the first agricultural

structure was constructed). Financing and closing costs for this loan alone exceeded $477,000. In addition, the USDA loan was made at an adjustable interest rate, which is now much higher than the fixed rate loan Makai Ranch previously obtained with a private lender.

B.    An additional private loan had to be obtained for MP Unit 21's Unit at a fixed rate of 10% per annum. At that time, typical interest rates ranged between 5% to 6%. However, the borrowers could not secure favorable financing because of the multiple pre-existing loan-related encumbrances on the Property, and the general delay in proceeding with infrastructure improvements as originally intended.

31.    Makai Ranch has invested no less than $16,999,986 in direct costs for pursuing, planning, designing, and constructing the infrastructure necessary to support anticipated uses of the Property, plus additional expenses for the planning, designing, and constructing other agriculture and infrastructure improvements, summarized as follows:

| Description | Capitalized Costs | Carrying Costs |
|---|---|---|
| Makai Ranch (Developer) | | |
| Development Costs | $10,285,395 | |
| Real Property Taxes | $245,979 | $421,868 |
| Insurance | $59,524 | $79,679 |
| Interest/Financing | $2,230,101 | $1,773,402 |
| Subtotal – Makai Ranch | $12,820,999 | $2,274,949 |

RCA Trade Center (Unit 20)

| | | | |
|---|---|---:|---:|
| | Development Costs | $929,580 | |
| | Real Property Taxes | -0- | $24,903 |
| | Insurance | -0- | $36,074 |
| | Interest/Financing | $18,000 | $895,481 |
| | Subtotal – RCA Trade Ctr | <u>$947,580</u> | <u>$956,458</u> |
| Total | | <u>$13,768,579</u> | <u>$3,231,407</u> |
| | | | <u>$16,999,986</u> |

32.     The foregoing does not include the original purchase price for the Property, substantial additional indirect costs, such as legal expenses, office, administrative, and utility expenses, and marketing and other selling expenses.

33.     Having incurred these significant costs, as more particularly described below, Plaintiffs have the following vested property rights:

A.     Makai Ranch has vested constitutional rights to approval of its previously applied-for roadway consolidation and re-subdivision, under DPP's File No. 2017/SUB-55, which is SMA-exempt.

B.     Makai Ranch has vested constitutional rights to approval of its previously applied-for agricultural consolidation and re-subdivision, under DPP's File No. 2020/SUB-25, which is SMA-exempt.

**STATUTORY AND REGULATORY FRAMEWORK**

**Subdivision Versus Condominium**

34.     A "subdivision" is a "division of land into two or more lots, parcels, sites or other divisions of land, including designation of easements, for the purpose, whether immediate or future, of sale, lease, rental, transfer of title to or any interest in, any or all of such lots, parcels, sites, easements or other divisions." Rev. Ord. of Honolulu ("**ROH**") § 22-3.2.

35.     By contrast, condominium units do not constitute lots for zoning and building purposes, and only legal lots can be used for zoning and building under the LUO. A condominium property regime delineates ownership; it does not create separate lots of record for subdivision and zoning purposes.

36.     Condominium property regimes are authorized under Hawaii Revised Statutes Chapter 514B. However, Chapter 514B is only one aspect of the condominium property regime law, and condominiums must still comply with other applicable laws. For example, a condominium property regime established under Chapter 514B "shall conform to the existing underlying county zoning for the property and all applicable county permitting requirements adopted by the county." Haw. Rev. Stat. § 514B-5.

37.     State law authorizes the development of a condominium project on agricultural land. *See* Haw. Rev. Stat. § 514B-52(b) ("application for registration

of a project in the agricultural district"). State law also authorizes a county to adopt limited supplemental rules to ensure the conformance of condominium property regimes to the purposes and provision of county zoning and development ordinances. *See* Haw. Rev. Stat. § 514B-6 ("the county may adopt supplemental rules governing condominium property regimes established under this chapter"). However, the City has not adopted any such supplemental rules.

**The Coastal Zone Management Act**

38.    All the Lots within the Project are located in the Special Management Area ("**SMA**") under the Coastal Zone Management Act, Haw. Rev. Stat. ch. 205A ("**CZMA**"). Under the CZMA, with certain exceptions, "development" is not allowed within the SMA without obtaining an SMA Permit. Haw. Rev. Stat. § 205A-28.

39.    Under Haw. Rev. Stat. § 205A-22, the "[u]se of any land for the purpose of cultivating, planting, growing, and harvesting plants, crops, tree, and other agricultural, horticultural, or forestry products or animal husbandry, or aquaculture or mariculture of plants or animals, or other agricultural purposes" is <u>not</u> development requiring an SMA permit. *See also* ROH § 25-1.3(H). This exemption is referred to as the "**Agricultural Use Exemption**."

40.    On September 15, 2020, Governor Ige signed Act 16 into law, which amended the CZMA. *See* 2020 Haw. Sess. Laws Act 16. Act 16 amended

Haw. Rev. Stat. § 205A-22, by changing the definition of activities that are <u>not</u> considered "development." Under Act 16:

> "Development" does not include the following:
>
> (1) Construction or reconstruction of a single-family residence that is less than seven thousand five hundred square feet of floor area, *is not situated on a shoreline parcel or a parcel that is impacted by waves, storm surges, high tide, or shoreline erosion,* and is not part of a larger development[.]

Haw. Rev. Stat. § 205A-22 (2020) (emphasis added).

41.    "Development" also does not include repair or maintenance of roads within existing rights-of-way, installation, repair and maintenance of underground utilities and minor appurtenant structures, use of land for agricultural purposes, transfer of title, and creation of rights in land. Haw. Rev. Stat. § 205A-22; ROH § 25-1.3

42.    Although Act 16 expanded the definition of "development" requiring an SMA Permit to include the construction of single-family residences on all shoreline parcels, Act 16 <u>did not</u> amend the Agricultural Use Exemption. Thus, it remains the law that "[u]se of any land for the purpose of cultivating, planting, growing, and harvesting plants, crops, tree, and other agricultural, horticultural, or forestry products or animal husbandry, or aquaculture or mariculture of plans or animals, or other agricultural purposes" is not "development" for purposes of SMA Permit requirements.

-18-

43.     Importantly, Act 16 provides: "This Act does not affect rights and duties that matured, penalties that were incurred, and proceedings that were begun before its effective date." 2020 Haw. Sess. Laws Act 16, § 13. In other words, Act 16 does not apply to projects that were already underway.

44.     The CZMA also includes (and included at the time these disputes arose) a discretionary component, providing "that whenever the authority finds that any excluded use, activity, or operation may have a cumulative impact, or a significant environmental or ecological effect on a special management area, that use, activity, or operation shall be defined as 'development' for purposes of this part," which would in turn necessitate an SMA Permit. Haw. Rev. Stat. § 205A-22. Similarly, the Revised Ordinances of Honolulu provide that if an agency finds the "cumulative impact" on the environment in the SMA of "any use activity, or operation . . . [that] is or may become part of a larger project" would be significantly adverse, an otherwise exempt project becomes "a 'development' for the purpose of this chapter," requiring an SMA Permit. *See* ROH § 25-1.3

**Automatic Approval**

45.     Hawaii state law provides, subject to certain exceptions, that "an agency shall adopt rules that specify a maximum time period to grant or deny a business or development-related permit, license, or approval" and that "[a]ll such issuing agencies shall take action to grant or deny any application for a business or

development-related permit, license, or approval within the established maximum period of time, or the application shall be deemed approved[.]" Haw. Rev. Stat. § 91-13.5(a)–(c).

46.    DPP's internal rules require it to act within thirty (30) days of receiving an applicant's proposed subdivision map. *See* Subdivision Rules and Regulations of the Planning Commission of the City and County of Honolulu, § 2-202(b).

## Subdivision Approval for Easements

47.    Under Chapter 22 of the ROH, an "easement" for anything other than utility purposes requires subdivision approval.

48.    This is because the Ordinances define "subdivision" to mean "[d]ivision of land into two or more lots, parcels, sites, or other divisions of land, ***including designation of easements***, for the purpose, whether immediate or future, of sale, lease, rental, transfer of title to or interest in, any or all of such lots, parcels, sites, easements, or other divisions." *Id.* § 22-3.2 (emphasis added).

49.    Thus, an easement that is properly approved by DPP is by definition the same as a "subdivision."

## OFFICIAL ASSURANCES

### Marconi Road Improvements

### *Official Assurances in Connection with the Kuilima SMA Application*

50.     On May 23, 1986, DPP, then known as the Department of Land Utilization ("**DLU**"), accepted an application submitted by KUILIMA DEVELOPMENT COMPANY ("**Kuilima**") for an SMA permit to expand the Turtle Bay Resort ("**Kuilima SMA Application**"). Kuilima sought an SMA permit in connection with its application for a subdivision to develop a master-planned resort community including hotels, dwellings, commercial areas, golf courses, parks, roadways, utilities, and other facilities.

51.     As part of the master plan submitted in connection with the Kuilima SMA Application, Kuilima proposed to dedicate a 37-acre oceanfront park for public use located from Kahuku Point to the eastern boundary of Hanakaʻilio Beach, which was designated as "Park P-2." Hanakaʻilio Beach is the beach immediately makai of the Property, and the eastern edge of Hanakaʻilio Beach is roughly in line with the eastern edge of the Property.

52.     Page 21 of the revised Environmental Impact Statement ("**EIS**") submitted in connection with the Kuilima SMA Application also referred to Park P-2, and states "[n]egotiations are under way with Campbell Estate to provide direct access to the park via Kahuku Airport Road." Further, if the Kulima SMA Application were "approved, Kahuku Airport Road would be improved to County standards." Other pages of the EIS show that the "Kahuku Airport Road" is the same as "Marconi Road," and proposed improvements to Marconi Road are discussed

throughout the EIS, the subsequent Final Supplemental version of the EIS, the Kuilima SMA Application, and a supporting traffic study.

53.    In granting the Kuilima SMA Application, and eventually, Kuilima's subdivision application, the City imposed several conditions. These included:

A.    A requirement that Kuilima record a park dedication providing that "off-site improvements leading to the park site will not be improved or provided until final subdivision approval for the condominiums to be built in Phase III is granted[.]" The "off-site improvements leading to the park site" include Marconi Road (Kahuku Airport Road), and this approval contemplates that Marconi Road would be improved at some point in the future.

B.    A requirement that prior to subdivision approval, Kuilima record a document "which provides for permanent access for the public to park P-2[,]" that "APPLICANT shall obtain and provide this access at its own cost[,] and that Kuilima would provide "full improvements up to the boundary of the park[.]"

54.    Although it was in the context of providing improved public access to Park P-2, the use and improvement of Marconi Road (Kahuku Airport Road) to County standards was approved as part of the Kuilima SMA Application. Marconi Road diverges at the southern boundary of the Property, and one road leads

to the main entry to the Property well the other road would run along the western boundary of the Property to Park P-2.

55.     On December 30, 1988, Makai Ranch's predecessor-in-interest entered into a Grant of Nonexclusive Easement (Access) in favor of Kuilima, filed as Land Court Document No. 1603996 and recorded in the Bureau of Conveyances at Liber 22730, Page 170 ("**Turtle Bay Easement**"). The Turtle Bay Easement granted Kuilima a 56-foot wide easement to the west of portions of the Property. The Turtle Bay Easement was to be used to widen Marconi Road to County standards to improve public access to Park P-2, as required by Kuilima's SMA permit. As a condition of the Turtle Bay Easement, Kuilima was required to improve the road (which it was required to do anyway under its SMA permit).[2]

56.     In connection with the Kuilima SMA Application, the DLU approved the Turtle Bay Easement for the express purpose of widening and improving Marconi Road, and approval of the Turtle Bay Easement constituted approval of a "subdivision" as defined in ROH § 22-3.2, and was therefore an official

---

[2] The obligation to improve Marconi Road has been the subject of dispute between Makai Ranch and Kuilima's successor-in-interest, TURTLE BAY RESORT, LLC. Makai Ranch maintains that Kuilima and its successors were obligated to widen and improve Marconi Road under the conditions of Kuilima's SMA permit and under the Turtle Bay Easement. As a means to shirk this responsibility, on October 6, 2017, TURTLE BAY RESORT, LLC executed a unilateral Notice of Abandonment of the Turtle Bay Easement, filed as Land Court Document No. T-10140441 and recorded as Document No. A-64880692.

assurance that widening and improvement of Marconi Road could proceed without an SMA Permit.

57.     DPP's requirement that Plaintiffs obtain subdivision approval (which approval requires an SMA permit) is duplicative in light of DLU's prior approval of the Kuilima SMA Application incorporating the Turtle Bay Easement.

58.     When Makai Ranch acquired the Property, it also acquired the land use entitlements appurtenant to the Property, whether sought and approved by the neighboring property owner or by Makai Ranch's predecessor-in-interest. Here, one of these entitlements is the entitlement, under the Kuilima SMA Application, to an approve subdivision for roadway expansion purposes in the area covered by the Turtle Bay Easement. Kuilima's SMA permit was an official assurance that Marconi Road could and would be expanded and improved, regardless of whether the improvement was for the benefit of the public to access Park P-2, for the quid-pro-quo benefit of Kuilima for approval of the other development proposed in the Kuilima SMA Application, or for the benefit of any other person who might make proper use of Marconi Road.

**DPP DEFENDANTS' WITHHOLDING OF APPROVALS**

**Withholding of Other Permits**

59.     In 2016, the owners of Units 8 and 11 submitted applications to DPP for building permits to construct farm dwellings, under Application Nos.

A-2016-06-0274 and A2016-08-1365. The owner of Unit 8 began to experience problems with the permitting delays and began the process of asserting a legal claim against Makai Ranch. To mitigate the owners' damages, Makai Ranch hired architect and third party reviewer WILLIAM WONG (and/or his firms Jenken Pacific Inc. and/or Asia Pacific Architectural Consultants, LLC) (collectively "Wong") as a Third-Party Reviewer, at Makai Ranch's cost, to facilitate expedited processing of the Unit 8 applications.

60.     Wong appeared to be processing the permit applications through DPP for Breen. Breen and Makai Ranch would periodically provide information to Wong in response to Wong's requests. On March 29, 2017, JACKSON LEE ("Lee"), who worked for Wong, sent an e-mail to Breen, which stated: "There is one obstacle preventing us from approving the permit application, DLR is requesting an archaeological inventory survey be conducted in the project area before the permit is issued, everything else is done." The following day, Makai Ranch provided Wong with a copy of the approval letter dated July 26, 2013, from the State Historic Preservation Division ("**SHPD**"), for the prior Archaeological Inventory Survey ("**AIS**") that had been performed for the entire Property. Upon information and belief, Lee forwarded a copy of the approval letter to LEHUA SOARES of SHPD, who then requested a site visit to the Project.

61.     Wong and Lee refused to accept SHPD's approval of the prior AIS that Makai Ranch conducted and which was previously accepted by SHPD for other permits, even when Makai Ranch produced a copy of the approval letter and other supporting documentation. Wong and Lee claimed that additional approvals were needed—for SHPD's architecture division and for SHPD's archaeology division. They claimed that the architecture division approved the AIS but additional approval from SHPD's archaeology division was still required. Wong and Lee refused to submit the AIS for approval. Wong was intentionally delaying and interfering with the processing of the Breen permits in an attempt to force Makai Ranch to pay additional consulting fees for an unnecessary AIS.

62.     On April 17, 2017, TIMOTHY HIU, as DPP's Deputy Director, wrote to Maki Ranch and stated: "We have a letter from the SHPD, that letter references that permit application number and states: 'Based upon this submittal, SHPD's determination for this project is "no historical properties affected."' SHPD review as part of the permit process is now complete." Despite this written confirmation from DPP's Deputy Director, Wong continued to refuse to further process the Breen permit applications. Makai Ranch confronted Wong with this information, and questioned why Wong was refusing to further process the applications on the basis that Makai Ranch needed to obtain and pay for an additional

archaeological survey when DPP's records said: "SHPD's favorable approval was already noted in the application file."

63.     On May 23, 2017, Mr. Henderson had a telephone conference with DPP's representative WENDEL KO to discuss the scope of Makai Ranch's project and ongoing construction activities. Mr. Ko was a supervisor in DPP's Building Division and eventually became its Chief Building Inspector. Mr. Ko conducted a site visit to the Property and was initially under the impression that Makai Ranch was planning to build "19 houses." Mr. Henderson corrected Mr. Ko's statement and confirmed that the project would include one farm dwelling per two acres, up to two farm dwellings per zoning lot. Mr. Ko expressly stated that if Makai Ranch would "stick with that [proposal] and apply for the permits, it should not be a problem." Mr. Henderson then mentioned that Makai Ranch had hired Wong and that Wong had "sabotaged the project." Mr. Ko agreed, "yeah, if you've been dealing with Bill Wong then you're all messed up . . . we got like three lawsuits against him." Mr. Henderson reiterated that the proposal was only to build two farm dwellings per lot, but if Makai Ranch wanted three to six farm dwellings per lot, then it would have to do a site development plan. Mr. Ko responded: "right, correct." Mr. Henderson continued that if Makai Ranch wanted to do more than six dwellings, it would have to apply for an agricultural cluster development, but that Makai Ranch did not intend to do an agricultural cluster development. Mr. Ko again responded,

"right, correct," and then continued "I think the City's under the impression that you're doing a cluster." Mr. Ko explained that he didn't want Makai Ranch to start pouring concrete until DPP was sure about the plans. Mr. Henderson responded that the only construction was related to agricultural buildings that were already approved. Mr. Ko responded, "year, if they're ag buildings, then that's fine." He continued, "yeah, I know Bill Wong, and they f***ed up everything. They're pretty bad." Mr. Henderson responded "we've done a complete AIS and SHPD has already approved it . . . it's already approved." Mr. Ko responded, "yeah SHPD will give you the approval, I know that's a fact."

64.     Based on these statements, DPP knew, as early as 2017, that Wong was interfering with permit applications.

65.     On April 26, 2017, Makai Ranch's counsel wrote a demand letter to Wong. As Makai Ranch learned through several Uniform Information Practices Act requests to DPP, a few days later, on April 28, 2017, an internal entry was made to the Breen permit file by "ch," who, upon information and belief, refers CALVERT HUNG. The entry incorrectly states, "Ag site dev dev [sic] plan req'd b/4 further processing." On May 2, 2017, without authorization from Makai Ranch or Breen, Wong sent a letter to DPP stating, "Please cancel the permit application immediately." On May 3, 2017, another internal entry was made in DPP's system, stating "Cancel job per letter from applicant, Kanani Padeken." On May 7, 2017,

Makai Ranch's counsel sent an additional demand letter to Wong. DPP's internal records are unclear, but on May 6, 2017 (or possibly on July 10, 2017), DPP rejected the permit application. The internal entry stated: "Review (Residential) plans for conformance[.] Status: Complete[.] Outcome: Plans rejected, Calvert Hung[.]"

66.    On May 11, 2017, DPP's representative verbally notified JERIN KELLY, an agent for the owner of Unit 8, that DPP would not process any further permit applications for the Property until the owners submitted agricultural site development plans. *See* LUO § 21-8.30.

67.    DPP was the subject of a public corruption scandal involving at least Wong, Padeken, and other DPP employees. Plaintiffs believe that, when Makai Ranch declined to pay additional consulting fees to Wong or his affiliates for a new AIS, Wong contacted Calvert Hung, Kanani Padeken, or some other employee at DPP, with whom Wong had a relationship, to cause DPP to stop, delay, or otherwise impede the processing of the Breen permit applications. Plaintiff believes this intentional delay was just one of many instances of the corrupt "pay to play" system that has been widely publicized in the news media as plaguing DPP.

68.    Thereafter, the DPP Defendants refused to issue any permits or approvals to Unit owners for nearly two years, citing among other things, the requirement of an SMA permit as

68.     a precondition of any future development. The withholding of the agricultural subdivision permit and roadway permits amounted to a regulatory taking of Makai Ranch's property rights. In addition, the DPP Defendants imposed different requirements on Makai Ranch than similarly situated condominium projects, each of which is zoned agricultural and within the SMA.

**Similarly-Situated Agricultural Projects**

69.     The most prominent example is the Kawela Mauka Ranches condominium project ("**Kawela Mauka Ranches**") located near Kawela Bay, which like the Property, is located within the SMA, and contains multiple zoning lots and multiple condominium units.[4]

A.     The "Waialee condominium project" consists of 43 acres of AG-1 zoned land ("**Lot 1188**") developed in two phases, known as "Kawela Mauka Ranches I" and "Kawela Mauka Ranches II." The project is located less than four (4) miles away from the Marconi Point Condominiums.

B.     Kawela Mauka Ranches I is located at 57-546 Kamehameha Highway, Kahuku, Hawaii 96731, covered by Tax Map Key No. (1) 5-7-001-042. Its developers of record are BRUCE LINDER and IRINA V. LINDER.

---

[4] The Kawela Mauka Ranches project is the same "Waialee condominium project" referred to in Plaintiffs' original complaint. The project is located near Waialee Beach in Kahuku. However, the formal name of the project is Kawela Mauka Ranches.

C.     Kawela Mauka Ranches II is located at 57-548 Kamehameha Highway, Kahuku, Hawaii 96731, and is covered by Tax Map Key No. (1) 5-7-001-041. Its developer of record is SEAN FRANCIS GINELLA.

D.     The Linders acquired the entire Lot 1188 by Deed from ORI ANUENUE HALE, INC. dated May 6, 2003, and filed with the Assistant Registrar of the Land Court as Document No. 2928646. The Lindners then conveyed a 13.37% undivided interest in Lot 1188 to Mr. Ginella by Deed dated August 18, 2006 and filed with the Assistant Registrar as Document No. 3490663. The Linders and Mr. Ginella then conveyed a 46.51% interest to KERRY KENT PAULSON and SALLY LEE PAULSON, by Deeds dated October 23, 2007 and filed with the Assistant Registrar as Document No. 3674588 and 3674589, respectively. The Lindners, Mr. Ginella, and the Paulsons entered into a Co-Tenancy Agreement dated October 25, 2007, filed as Land Court Document No. 3674590. Mr. Ginella and the Paulsons were successors-in-interest to the Linders.

E.     In 2009, the Linders, Mr. Ginella, and the Paulsons entered into a Declaration of Restrictive Covenants, filed as Land Court Document No. 3919736. The Declaration restricts use of Lot 1188 to agricultural purposes, which was a requirement for subdivision of Lot 1188. The developers then subdivided Lot 1188 into four (4) separate lots. The agricultural subdivision application was approved, and Lot 1188 was subdivided into Lots 1268 (10.006 acres), 1269 (10.000

acres), 1270 (11.998 acres), and 1271 (10.996 acres), all as shown on Land Court Map No. 182 filed with Land Court Application No. 1095 of the Trustees under the Will and of the Estate of James Campbell, deceased.

F.    The Linders then imposed a four (4) unit condominium property regime on their subdivided Lot 1271, and Mr. Ginella imposed a five (5) unit condominium property regime on his subdivided Lot 1270. The Real Estate Commission issued an effective date for the Linders' Developer's Public Report of October 4, 2012, and an effective date for Mr. Ginella's Public Report the same day.

G.    There is a two-story, 3,300 square foot farm dwelling constructed on Unit 1 of Kawela Mauka Ranches I. There is a two-story, 3,400 square foot farm dwelling constructed on Unit 4. Unit 2 and Unit 3 are unimproved.

H.    There is a two-story, 3,180 square foot farm dwelling constructed on Unit A of Kawela Mauka Ranches II. There is a two-story, 2,898 square foot farm dwelling constructed on Unit B. Units C, D, and E are unimproved.

70.    The Kawela Mauka Ranches project is essentially the same kind of agricultural condominium Plaintiffs were trying to implement. In fact, Plaintiffs' condominium counsel also represented the developers of the Kawela Mauka Ranches project. In theory, following the agricultural subdivision of Lot 1188 into four (4) zoning parcels, up to two (2) farm dwellings could be constructed on each parcel without the need for an SMA permit, up to eight (8) farm dwellings in total.

Makai Ranch's proposed Agricultural Subdivision would also have created four (4) zoning parcels, for construction of up to two (2) farm dwellings per parcel, for a total of eight (8) farm dwellings in total.

71.    Another example is the Kahena Wai Estates condominium project located in Hauula, which like the Property, is located within the SMA, and contains multiple condominium units.

A.    The Kahena Wai Estates condominium project consists of 4.7625 acres of AG-2 and R-5 zoned land. The project consists of a single zoning lot generally located at 53-440 Kamehameha Highway, Hauula, Hawaii 96717, covered by Tax Map Key No. (1) 5-3-005-070.

B.    The developer, KAHENA WAI ESTATES LLC, a Hawaii limited liability company, imposed an eleven (11) unit condominium property regime, creating condominium units numbered one (1) through eleven (11).

C.    There is a one-story, 600 square foot farm dwelling constructed on Unit 1. There is a one-story, 552 square foot farm dwelling constructed on Unit 2. There is a one-story, 678 square foot farm dwelling constructed on Unit 3. There is a one-story, 696 square foot farm dwelling constructed on Unit 8. There is a one-story, 808 square foot farm dwelling constructed on Unit 9. The remaining Units are unimproved.

72.     Another example is the Kealia Farms condominium project located in Waialua, which like the Property, is located within the SMA, and contains multiple condominium units.

A.      The Kealia Farms condominium project consists of 13.089 acres of AG-2 zoned land. The project consists of a two zoning lots generally located at 68-1031 Farrington Highway, Waialua, Hawaii 96791, covered by Tax Map Key No. (1) 6-8-002-010.

B.      The developers, SAFE INVESTMENT PROPERTIES, LLC, a Washington limited liability company, 20 BALDWIN PARTNERS LLC, a Hawaii limited liability company, and MOANA KEALII LLC, a Hawaii limited liability company, imposed a four (4) unit condominium property regime, creating condominium units numbered one (1) through four (4).

C.      There is a one-story, 1,488 square foot farm dwelling constructed on Unit 3. There is a one-story, 1,980 square foot farm dwelling constructed on Unit 4. Units 1 and 2 are unimproved.

**Deferral of Makai Ranch's Roadway Subdivision Application**

73.     Makai Ranch, for itself and for certain adjoining property owners, submitted a subdivision application under File No. 2017/SUB-55 ("**Roadway Subdivision**"). The Roadway Subdivision application was discussed between DPP and Makai Ranch's new consultant, Group 70 International, Inc.,

doing business and commonly known as "G70" or "Group 70," prior to submission of the subdivision application. During these discussions, DPP requested that the Plaintiffs submit a subdivision application to bring the existing nonconforming 20-foot wide Marconi Road right-of-way into conformance by widening it to 44-feet-wide in accordance with then-current City and County of Honolulu agricultural standards. DPP represented to Group 70 that Makai Ranch could proceed with the subdivision of the entire Property after completing the Roadway Subdivision. The purpose of this Roadway Subdivision is to consolidate and re-subdivide a portion of Lot E, a portion of Lot 161, a portion of Lot 26, Lot 25 (a 20-foot-wide nonconforming roadway lot), Lot F-1 ( a 20-foot-wide nonconforming roadway lot) and Lot F-2 (a 20-foot-wide nonconforming roadway lot) to widen Marconi Road to provide the conforming 44-foot right-of-way. The widening of Marconi Road will benefit owners of Units within the Project, including Plaintiffs, as well as the neighboring property owners that use Marconi Road. The Roadway Subdivision did not propose to create any new dwelling units or rights nor change any use of the Property. It was simply to bring the nonconforming roadway into conformance with current standards.

74. DPP issued a deferral letter for the Roadway Subdivision dated June 2, 2017, requiring "Compliance with the Special Management Area (SMA) provisions of Chapter 25, Revised Ordinances of Honolulu, with regards to the

proposed 26-unit condominium development, including existing and proposed subdivision infrastructure improvements." In other words, DPP was withholding approval of all development activities related to the Project, even activities that were indisputably SMA-exempt, based on DPP's erroneous conclusion that some development activities would require an SMA Permit. An unknown representative of DPP signed the deferral letter on behalf of DPP's Acting Director.

75.     However, DPP's own internal Environmental Checklist for the proposed subdivision, prepared by DPP's staff planner K. Oyama, indicates that although the Project is located within the SMA, the roadway subdivision was *not* considered "development" and was SMA-exempt under ROH § 25-1.3(2)(M).

76.     In its deferral letter, the DPP Defendants claimed that Makai Ranch's prior correspondence, the developer's public report, and the "recent building permit applications" were the basis for the DPP Defendants' determination that "additional development is intended for the subject properties." *See* Ex. H. The DPP Defendants improperly deferred the Roadway Subdivision application based on Makai Ranch's *possible future development* of the Property.

77.     In addition, the deferral letter does not account for the fact that the roadway expansion and improvement already received subdivision approval by virtue of the DLU's approval of the Turtle Bay Easement.

78.     Since the deferral letter, the DPP Defendants have continued to refuse to approve the Roadway Subdivision and have now taken the position that an SMA Permit is required because of the amendments to the CZMA effected by Act 16. The DPP Defendants took this position despite the fact that Makai Ranch submitted its Roadway Subdivision application prior to the enactment of Act 16, and further despite the fact that the Roadway Subdivision remains SMA-exempt despite the enactment of Act 16.

79.     Through counsel, Makai Ranch responded by letter dated August 25, 2017. In the letter, Makai Ranch explained:

> The Coastal Zone Management Act exempts certain activities from "development" requiring SMA permits. Significantly, these include: construction of a single family residence under 7,500 square feet that is not part of a larger development; repair or maintenance of roads within existing rights-of-way; repair and maintenance of underground utilities and minor appurtenant structures; use of land for agricultural purposes; transfer of title; creation of rights in land; installation of underground utility lines. Haw. Rev. Stat. § 205A-22; *see also* ROH § 25-1.3.

> The registration of the CPR, and the sale of CPR units, is exempt from the SMA laws. Haw. Rev. Stat. § 205A-22 ("(10) Creation or termination of easements, covenants, or other rights in structures or land" and "(9) Transfer of title to land"). The exemption of CPR registration and sale from "development" for purposes of the CZMA makes sense because, as Director Atta wrote about this condominium project: "CPR delineates ownership; it does not create separate lots of record for subdivision and zoning purposes."

Also significantly for all of Makai Ranch's proposed agricultural uses and structures, including farm dwellings, use of any land for agricultural purposes is exempt from the SMA. Haw. Rev. Stat. § 205A-22 ("(8) Use of any land for the purpose of cultivating, planting, growing, and harvesting plants, crops, trees, and other agricultural, horticultural or forestry products or animal husbandry, or aquaculture or mariculture of plants or animals, or other agricultural purposes"). Farm dwellings are permitted agricultural uses on both prime and non-prime Agricultural classified land under state law and AG-2 zoning, as are numerous other types of agricultural and accessory structures. Furthermore, single-family residences are exempt when not part of a larger development. Haw. Rev. Stat. § 205A-22(1).

In this case, two unit owners have applied for farm dwelling building permits within their own limited common elements, which is exempt as both an agricultural purpose and a farm dwelling, statutorily defined as "a single-family dwelling located on and used in connection with a farm." Haw. Rev. Stat. § 205-4.5(a)(4).

The DPP has repeatedly confirmed that the agricultural uses and structures to be placed on the property are not subject to SMA permitting . . . .

Furthermore, basing a refusal to issue a farm dwelling permit based on ROH § 25-6.3 is not justified. That provision states "No development or structure shall be constructed within the special management area without first obtaining a special management area use permit, a minor permit or being exempted pursuant to the provisions of this chapter." ROH § 25-6.3 In 2014, DPP informed Makai Ranch that farm dwellings that complied with the LUO development standards would be exempt from the SMA. The DPP cannot take a contrary position in 2017.

80. Makai Ranch's infrastructure improvements including agricultural roadways, drainage infrastructure, ponds, water, fire protection, and electricity, were covered in the approved Soil and Water Conservation Plan and intended to allow greater and more efficient agricultural use of the Property. The proposed infrastructure improvements meet Natural Resource Conservation Service Practice Standards and City and County of Honolulu engineering standards for agriculturally-zoned property.

81. In 2011, James Campbell Company, LLC submitted a subdivision application under File No. 2011/SUB-120. The purpose of the application was to subdivide a portion of former Lot 1204 as shown on Map 167 of Land Court Application into two lots for conveyance to the U.S. Fish and Wildlife Service as part of the James Campbell National Wildlife Refuge Expansion, which became known as Lots 1204-B and 1204-C, and the remainder of Lot 1204 became Lot 1204-A, which is of a sufficient width for a conforming roadway, for "future roadway, utility and landscaping purposes." Subdivision Application No. 2011/SUB-120 was approved without an SMA permit. The approval letter and supporting maps expressly acknowledged that Lot 1204-A was for "future roadway" purposes. Lot 1204-A is a portion of Marconi Road located mauka of the Property. Approval of Subdivision Application No. 2011/SUB-120 for a "future roadway"

without the requirement of an SMA permit was an official assurance that an SMA permit would not be required when the time came to improve Marconi Road.

**Deferral and Expiration of Agricultural Subdivision Application**

82.     On February 14, 2020, Makai Ranch applied for a low-density, large lot, agricultural consolidation/subdivision to create four agricultural lots between 20.079 and 22.379 acres and a 44-foot wide right-of-way on the Property, DPP's File No. 2020/SUB-25 ("**Agricultural Subdivision**"). In response to the Agricultural Subdivision application, DPP issued a deferral letter on April 24, 2020, listing various conditions and clarifications required before approval. On May 8, 2020, DPP provided a supplemental deferral letter listing additional conditions. An unidentified representative of DPP signed both letters on behalf of its Acting Director.

83.     Through counsel, Makai Ranch responded to each of the items listed in the deferral letters by way of a letter dated August 27, 2020. Makai Ranch's design firm and agent, G70, provided a separate response to DPP by way of a letter dated August 28, 2020. Both response letters resolved each and every item listed in both of DPP's deferral letters.

84.     Under Rule 2-202(b) of DPP's Subdivision Rules and Regulations, DPP was required to act within thirty (30) days of receiving the

responses, i.e., by September 30, 2020. Under Haw. Rev. Stat. § 91-13.5, DPP's failure to respond within the 30-day deadline results in automatic approval.

85.    Through counsel, Makai Ranch sent a letter to DPP dated January 22, 2021, confirming the automatic approval of the Agricultural Subdivision. However, DPP, did not formally respond to Makai Ranch's confirmation of automatic approval until June 28, 2021—five months later.

86.    In its June 28, 2021 letter, DPP claimed that the subdivision application had expired. Rather than accepting that Rule 2-202(b) required automatic approval, DPP did not acknowledge that Makai Ranch's responses had addressed all of its previous comments and conditions. Upon information and belief, the purpose of claiming that the subdivision application expired was to require Makai Ranch to submit a new subdivision application. Although the Agricultural Subdivision would still be SMA-exempt under Act 16, the timing would give the DPP Defendants further leeway to deny the Agricultural Subdivision under the auspices of Act 16.

87.    On November 8, 2021, Makai Ranch again wrote to DPP's Director to explain Makai Ranch's position in an attempt to resolve the DPP Defendants' concerns and obtain approval of the Agricultural Subdivision. This letter again set forth Makai Ranch's position regarding automatic approval and explained how each deferral condition had been resolved or did not apply. DPP's representative, KELA M. HIRAMOTO, acknowledged receipt of the e-mailed

November 8, 2021, letter, and indicated that she would forward the letter to DPP's administration. If DPP had reason to deny the Agricultural Subdivision Application, it was incumbent upon DPP to respond to prevent an automatic approval.

88.     DPP Director DEAN UCHIDA finally responded to the November 8, 2021, letter over two months later, on January 21, 2022. In this letter, the DPP Defendants again claimed wrongfully that the Agricultural Subdivision application had expired, refusing to accept the automatic approval provisions of Subdivision Rule 2-202(b). The letter incorrectly states: "As the entire property is in a Special Management Area (SMA), these unpermitted structures, as well as any existing, proposed, or planned structures, and improvements to the property, which constitute a larger project, are subject to SMA review and permitting." This statement improperly ignores construction that is not considered "development" under the CZMA and the Agricultural Use Exception, and improperly applies Act 16 to the Project although development of the Project was already well underway years prior to the enactment of Act 16. Further, the letter incorrectly states that DPP identified "multiple new structures […] constructed without building permits", notwithstanding the fact that Haw. Rev. Stat. § 46-88 exempts such agricultural structures from the building permit requirements.

89.     Since receiving the letter dated January 21, 2022, Makai Ranch received approval for the electrical permit, and agreed to the dry floodproofing recommendations in the same letter.

**DPP Exercise of Discretion**

90.     The CZMA includes a discretionary component, providing "that whenever the authority finds that any excluded use, activity, or operation may have a cumulative impact, or a significant environmental or ecological effect on a special management area, that use, activity, or operation shall be defined as 'development' for the purpose of this part.'" Haw. Rev. Stat. § 205A-22. Similarly, the Revised Ordinances of Honolulu ("**ROH**") provide that if an agency finds that the "cumulative impact" on the environment in the SMA of "any use activity, or operation. . . [that] is or may become part of a larger project" would be significantly adverse, an otherwise exempt project becomes "a 'development' for the purpose of this chapter," requiring an SMA Permit. *See* ROH § 25-1.3.

91.     By statute, DPP may have the discretion to determine whether a proposed use constitutes "development." However, in this case, DPP's decision is not a valid exercise of its discretionary authority. The statutes require DPP to find that the cumulative impact on the environment would be significantly adverse. DPP did not make any such finding. Its officials decided to require an SMA Permit because of their alliance with William Wong, and Plaintiffs' refusal to participate in

his pay-to-play scheme, *not* because of any finding that the cumulative impact on the environment would be significantly adverse.

92.     In deference to an agency's independence, courts limited judicial review of the decision making process. Three exceptions to judicial restraint exist: (1) if there are other than designated decision makers; (2) if the decision maker engaged in improper conduct; and (3) if the record fails to explain adequately the administrative action. *See, e.g.*, *Kilauea Neighborhood Ass'n v. Land Use Comm'n*, 7 Haw. App. 227, 229-30, 751 P.2d 1031, 1033-34 (1988) (citations omitted); *Feliciano v. Bd. of Trs.*, 4 Haw. App. 26, 31, 659 P.2d 77, 81 (1983) (citations omitted); *see also* Haw. Rev. Stat. § 91-14(g)(6).

93.     All three exceptions to judicial restraint exist in this case. First, Defendants' decisions were not actually made by Defendants' employees acting within the scope of their discretion. Instead, these employees, including without limitation Calvert Hung and Kanani Padeken, were acting at the direction of William Wong, who was not a DPP decision maker. Second, Defendants' employees engaged in improper conduct, by allowing William Wong to corrupt Defendants' otherwise discretionary decision making process. Although it is not yet known in this case whether any of Defendants' employees accepted cash bribes or other favors from William Wong in exchange for their actions on Plaintiffs' applications, William Wong and Defendants' employees *have been convicted* of engaging in such conduct

with respect to at least *some* administrative actions. Finally, Defendants' decision making was arbitrary and capricious and not actually supported by the facts. In light of the timing of Defendants' decision to halt processing Plaintiffs' applications— within mere days of Wong's request to cancel Plaintiffs' applications, these decisions were not made with the requisite findings necessary to support a valid agency decision. In total, even if Defendants had discretionary authority, they exercised their discretion in a manner that was in violation of the U.S. and Hawaii constitutions, applicable statutes, upon unlawful procedure, clearly erroneous in light of the evidence, arbitrary, capricious and in abuse of their discretion.

## GENERAL CONSTITUTIONAL PRINCIPLES

94.     The Fifth Amendment of the United States Constitution, made applicable to the States through the Fourteenth Amendment, provides that private property shall not "be taken for public use, without just compensation." The Fifth Amendment is intended to prevent the government from forcing some people alone to bear public burdens, which, in all fairness and justice, should be borne by the public as a whole. *Palazzolo v. Rhode Island*, 533 U.S. 606, 617-18 (2001). "[T]he Fifth Amendment is violated when land-use regulation 'does not substantially advance legitimate state interests or denies an owner economically viable use of his land.'" *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1016 (1992). "Where a regulation places limitations on land that fall short of eliminating all economically

beneficial use, a taking nonetheless may have occurred, depending on a complex set of factors including the regulation's economic effect on the landowner, the extent to which the regulation interferes with reasonable investment-backed expectations, and the character of the government action." *Palazzolo*, 533 U.S. at 618; *see Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 538–39 (2005); *Penn Cent. Transp. Co. v. New York City*, 438 U.S. 104, 123–24 (1978). Hawaii's Constitution also prohibits the uncompensated taking or damaging of property. Article I, Section 20 of the Hawaii Constitution provides: "[p]rivate property shall not be taken or damaged for public use without just compensation."

95.     Plaintiffs' real property interests are constitutionally protected by Plaintiffs' due process rights under the United States and Hawaii Constitutions. The basic elements of procedural due process of law require notice and an opportunity to be heard at a meaningful time and in a meaningful manner before governmental deprivation of a significant property interest. *Sandy Beach Def. Fund. v. City Council of the City & Cnty. of Honolulu,* 70 Haw. 361, 378, 773 P.2d 250, 261 (1989) (*citing Mathews v. Eldridge,* 424 U.S. 319, 333 (1976)). Due process also includes a substantive component that guards against arbitrary and capricious government action that has no substantial relation to the public health, safety, morals, or general welfare. *Lopez v. State*, 133 Hawaiʻi 311, 322, 328 P.3d 320, 331 (2014) (*quoting In re Herrick*, 82 Hawaii 329, 349, 922 P.2d 942, 962 (1996)).

96.    The Equal Protection Clauses of the United States and Hawaii Constitutions mandate that all persons similarly situated shall be treated alike, both in privileges conferred and in the liabilities imposed. Equal protection jurisprudence is concerned with governmental classifications that affect some groups of citizens differently than others. *Engquist v. Oregon Dept. of Agric.*, 553 U.S. 59, 601 (2008). In addition, as a "class of one" a plaintiff may bring suit alleging that [he/she] has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment. *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000).

**[COUNT I-A WAS PREVIOUSLY DISMISSED]**

**COUNT I–B**
**DECLARATORY RELIEF**
**(Roadway Subdivision)**

97.    Plaintiff incorporates by reference each of the allegations in all previous paragraphs.

98.    An actual controversy exists between Plaintiffs and Defendants because Defendants have refused to approve Makai Ranch's Roadway Subdivision application, even though Makai Ranch has met all legal requirements, leaving litigation imminent and inevitable.

99.    Defendants are indefinitely and arbitrarily withholding approval of Makai Ranch's Roadway Subdivision, and have not given any legally cognizable justification for their refusal to approve Makai Ranch's Roadway Subdivision.

100.    In addition, Defendants have refused to permit improvement of Marconi Road without a subdivision, despite improvement of Marconi Road being a condition of Kuilima's SMA permit approved in 1986, and approval of the access easement granted to Kuilima by Makai Ranch's predecessor in interest, which otherwise constitutes approval of a "subdivision." Kuilima's SMA permit was dependent upon the improvement of Marconi Road, yet Defendants have permitted Kuilima's subdivision to proceed based only on conceptual improvements. Makai Ranch's Agricultural Subdivision application, on the other hand, would not be approved by DPP until Marconi Road was improved (which required the Roadway Subdivision).

101.    A declaratory judgment will serve to terminate the uncertainty or controversy giving rise to this proceeding. Plaintiffs are entitled to a declaration that the Defendants are violating State laws and County ordinances by not performing their ministerial and non-discretionary duty to approve Makai Ranch's Roadway Subdivision, and/or to issue permits for improvement to Marconi Road without the requirement of a subdivision, and/or to recognize the roadway expansion as an approved "subdivision" by virtue of DLU's approval of the Kuilima Application.

Specifically, Plaintiffs are entitled to a declaration that the DPP Defendants may not withhold its approval of the Roadway Subdivision based on the requirement of an SMA Permit, or that Defendants may not withhold approval of permits required for Plaintiffs to improve Marconi Road without an additional subdivision and without an SMA Permit.

102. Defendants gave Plaintiffs official assurances that an SMA Permit would not be required for Makai Ranch to pursue its planned agricultural development. Plaintiffs were entitled to rely, and actually, substantially, and materially did rely on these official assurances, which resulted in their good faith expectancy that their development approvals would be obtained upon meeting other required conditions but without the need for a SMA Permit. In reliance on these official assurances, Plaintiffs acquired their properties and proceeded with their development plans at substantial cost. As a consequence of these official assurances and Plaintiffs' reasonable reliance thereon, Plaintiffs possess property interests that cannot be taken away, and vested rights to proceed as they were assured. By virtue of these assurances, Defendants are equitably estopped from withholding Roadway Subdivision approval, and Plaintiffs are entitled to a declaratory judgment to that effect.

**COUNT I-C**
**DECLARATORY RELIEF**
**(Agricultural Subdivision)**

103.    Plaintiff incorporates by reference each of the allegations in all previous paragraphs.

104.    An actual controversy exists between Plaintiffs and Defendants because Defendants have refused to approve Makai Ranch's Agricultural Subdivision application, or recognize that Makai Ranch's Subdivision application was automatically approved under Haw. Rev. Stat. § 91-13.5(a)–(c) and Section 2-202(b) of DPP's Subdivision Rules, even though Makai Ranch has met all legal requirements, leaving litigation imminent and inevitable.

105.    Defendants are indefinitely and arbitrarily withholding approval of Makai Ranch's Agricultural Subdivision, and/or refusing to or recognize that Makai Ranch's Subdivision application was automatically approved, and have not given any legally cognizable justification for their refusal to approve or recognize automatic approval of Makai Ranch's Agricultural Subdivision.

106.    A declaratory judgment will serve to terminate the uncertainty or controversy giving rise to this proceeding. Plaintiffs are entitled to a declaration that Defendants are violating State laws and County ordinances by not performing their ministerial and non-discretionary duty to approve Makai Ranch's Agricultural Subdivision. Specifically, Plaintiffs are entitled to a declaration that Defendants may

not withhold their approval of, or refuse to recognize automatic approval of, the Agricultural Subdivision, based on the requirement of an SMA Permit.

107.    Defendants gave Plaintiffs official assurances that an SMA Permit would not be required for Makai Ranch to pursue its planned agricultural development. Plaintiffs were entitled to rely, and actually, substantially, and materially did rely on these official assurances, which resulted in their good faith expectancy that their development approvals would be obtained upon meeting other required conditions but without the need for an SMA Permit. In reliance on these official assurances, Plaintiffs acquired their properties and proceeded with their development plans at substantial cost. As a consequence of these official assurances and Plaintiffs' reasonable reliance thereon, Plaintiffs possess property interests that cannot be taken away, and vested rights to proceed as they were assured. By virtue of these assurances, Defendants are equitably estopped from withholding Agricultural Subdivision approval and/or refusing to recognize automatic approval of the Agricultural Subdivision, and Plaintiffs are entitled to a declaratory judgment to that effect.

**[COUNT II-A WAS PREVIOUSLY DISMISSED]**

**COUNT II-B:**
**INJUNCTIVE RELIEF**
**(Roadway Subdivision)**

108.   Plaintiffs incorporate by reference each of the allegations in all previous paragraphs.

109.   Subdivision applications such as the Roadway Subdivision are ministerial and thus, Defendants have no discretion in withholding approval where legal requirements have otherwise been satisfied. Defendants have acknowledged that an SMA Permit is not required for the Roadway Subdivision, and are therefore estopped from claiming otherwise. In addition, Act 16 cannot be applied retroactively to preclude the approval of the Roadway Subdivision that is otherwise allowable under applicable law. Plaintiffs are entitled to an order preliminarily and permanently enjoining Defendants from refusing to approve the Roadway Subdivision. No other remedies are available because without the Roadway Subdivision, Plaintiffs are unable to proceed with the development of the Project and the exercise of their vested real property rights.

**COUNT II-C:**
**INJUNCTIVE RELIEF**
**(Agricultural Subdivision)**

110.   Plaintiffs incorporate by reference each of the allegations in all previous paragraphs.

111.   Subdivision applications such as the Agricultural Subdivision are ministerial and thus, Defendants have no discretion in withholding approval where legal requirements have otherwise been satisfied. Defendants have acknowledged

that an SMA Permit is not required for the Agricultural Subdivision, and are therefore estopped from claiming otherwise. In addition, Act 16 cannot be applied retroactively to preclude the approval of the Agricultural Subdivision that is otherwise allowable under applicable law. Plaintiffs are entitled to an order preliminarily and permanently enjoining Defendants from refusing to approve the Agricultural Subdivision, and/or from refusing to recognize that the Agricultural Subdivision was automatically approved. No other remedies are available because without the Agricultural Subdivision, Plaintiffs are unable to proceed with the development of the Project and the exercise of their vested real property rights.

## COUNT III:
## INVERSE CONDEMNATION

112.   Plaintiffs incorporate by reference each of the allegations in all previous paragraphs.

113.   Plaintiffs acquired their property interests with the investment-backed expectations to subdivide, use and improve their property for agricultural and other permissible uses. Defendants' conduct has deprived Plaintiffs of their right to use and enjoy their property for the purposes intended.

114.   To the extent Plaintiffs have been unable to use and/or will be unable to use their property for their intended purposes, based on their legitimate investment-backed expectations, just compensation is due from the City for the loss of Plaintiffs' property rights under the United States and Hawaii Constitutions.

Plaintiffs are also entitled to a judicial declaration that Defendants have taken Plaintiffs' real property rights.

**COUNT IV:**
**DENIAL OF DUE PROCESS**

115.   Plaintiffs incorporate by reference each of the allegations in all previous paragraphs.

116.   Plaintiffs have been afforded neither notice nor an opportunity to be heard at a meaningful time and in a meaningful manner before being deprived by Defendants of Plaintiffs' significant property interests. By their actions, Defendants have taken and interfered with Plaintiffs' real property rights in violation of Plaintiffs' procedural due process rights.

117.   Defendants have denied Plaintiffs their substantive due process rights under the Hawaii and United States Constitutions by arbitrarily and capriciously withholding approval of Makai Ranch's Roadway Subdivision and Agricultural Subdivision applications, and/or with respect to the Agricultural Subdivision, refusing to recognize automatic approval. By their actions, Defendants have taken and interfered with Plaintiffs' real property rights in violation of Plaintiffs' substantive due process rights.

118.   Plaintiffs are entitled to a declaration that Defendants have deprived Plaintiffs of their procedural and substantive due process rights, and to a mandatory injunction and mandamus relief ordering Defendants to approve Makai

Ranch's Roadway Subdivision and Agricultural Subdivision applications, and/or with respect to the Agricultural Subdivision, recognizing automatic approval.

## COUNT V:
## EQUAL PROTECTION

119.   Plaintiffs incorporate by reference each of the allegations in all previous paragraphs.

120.   Defendants have intentionally singled out and treated Plaintiffs differently from other owners of similar real property, who own and have successfully pursued similar agricultural development projects, by withholding approval of Makai Ranch's Roadway Subdivision and Agricultural Subdivision applications. Defendants have denied Plaintiffs equal protection under the United States and Hawaii Constitutions by singling Plaintiffs out for different treatment than Plaintiffs' neighbors.

121.   Plaintiffs are entitled to a declaration that the DPP Defendants have violated Plaintiffs' equal protection rights, and to a mandatory injunction and mandamus relief ordering Defendants to approve Makai Ranch's Roadway Subdivision and Agricultural Subdivision applications.

## COUNT VI:
## VIOLATION OF HAW. REV. STAT. CHAPTER 92F

122.   Plaintiffs incorporate by reference each of the allegations in all previous paragraphs.

123.   The people of the State of Hawaii, acting through their legislature, declared "it is the policy of this State that the formation and conduct of public policy—the discussions, deliberations, decisions, and actions of government agencies—shall be conducted as openly as possible," Haw. Rev. Stat. § 92F-2, and "all government records are open to public inspection unless access is restricted or closed by law," Haw. Rev. Stat. § 92F-11(a).

124.   Plaintiffs bring this Count pursuant to the Hawaii Uniform Information Practices Act, Haw. Rev. Stat. ch. 92F ("UIPA"), to compel disclosure of various information and documents pertaining to the DPP's investigations of widespread public corruption within its agency. The request is the subject of a pending appeal to the Hawaii Office of Information Practices ("OIP"). However, OIP advised Plaintiffs that due to short staffing and a significant backlog, Plaintiffs' appeal would not be adjudicated in a timely manner and thus Plaintiffs should consider initiating a court proceeding.

125.   Plaintiffs are "persons" within the meaning of Haw. Rev. Stat. § 92F-3, have been "aggrieved by a denial of access to a governmental record" as defined by Haw. Rev. Stat. § 92F-15(a). UIPA permits a party to submit a request either anonymously or under a pseudonym, but Fed. R. Civ. P. 17(a)(1) requires an action to be prosecuted in the name of the real party in interest. Although the UIPA request was made in the name of Plaintiffs' counsel, it was for the use and benefit of

Plaintiffs. Plaintiffs are therefore the parties "aggrieved by a denial of access to a governmental record" and therefore have standing to pursue these claims.

126.   This Court has jurisdiction to consider claims under UIPA because although UIPA rests jurisdiction in State court, such jurisdiction is not exclusive. *Sierra Club v. City & Cty. of Honolulu*, No. 04-00463 DAE/BMK, 2009 U.S. Dist. LEXIS 285, at *4 n.1 (D. Haw. Jan. 6, 2009). Thus, the Court may properly exercise supplemental jurisdiction over Plaintiffs' UIPA claims under 28 U.S.C. § 1367.

127.   On August 19, 2021, Plaintiffs, through their counsel, sent a "Request for Access to Government Records" to DPP, requesting five categories of information. DPP ultimately denied access[5] to four of the five categories of Plaintiffs' request, which sought the following:

> (1)   Copies of all documents, correspondences, emails and attachments, records, files, handwritten notes, text messages, phone records, and communications provided to the United States Federal Bureau of Investigation (FBI), the office of the United States Attorney for the District of Hawaii, and/or any other federal or State investigative or law enforcement agency, related to investigations of William Wong, Wayne Inouye, Kanani Padeken, Jocelyn Godoy, Jason Dadez, and/or Jennie Javonillo;
>
> (2)   A list of all permit applications submitted between January 1, 2017 through present, which were at any point assigned for

---

[5] After Plaintiffs appealed the denial of their request to OIP, DPP produced additional documents in response to the second category of Plaintiffs' request.

review by WAYNE INOUYE, KANANI PADEKEN, JOCELYN GODOY, JASON DADEZ, and/or JENNIE JAVONILLO, *or*, if a list is unavailable, then copies of documents or other records confirming specific permit applications assigned to the foregoing individuals for review;

(3)   Copies of all documents, correspondence, emails and attachments, records, files, handwritten notes, text messages, phone records, and communications between any employee or representative of the Department of Planning and Permitting and FBI Agent in Charge Eli S. Miranda;

(4)   Pursuant to HRS 92F-14(b)(4)(B), information related to employment misconduct that resulted in discharge of one or more of the employees identified in Item (2) above, including without limitation, the name of the employee, the nature of the employment related misconduct, the Department of Planning and Permitting's summary of the allegations of misconduct, findings of fact and conclusions of law, and the disciplinary action taken by the Department of Planning and Permitting; and

(5)   Copies of all Government Records produced to other requestors in response to requests concerning allegations of public corruption within the Department of Planning and Permitting, including without limitation misconduct by any of the individuals named above, to the extent not already produced pursuant to Items (1) through (4).

128.   DPP set forth its denial in a "Notice to Requester" dated September 14, 2021 from DPP's representative, BARBARA YONEDA. According to the Notice, the government records "must be confidential to avoid the frustration of a legitimate government function." The justification for the denial was "Conducting personnel investigation." DPP cited three sections of UIPA as justification for its denial of categories 1, 3, and 4, which were Haw. Rev. Stat.

§§ 92F-13(3), 92F-14(b)(2), and 92F-22(4). However, none of these statutes justify DPP's complete denial of disclosure. DPP has the burden of proof to establish its justification for nondisclosure. Haw. Rev. Stat.§ 92F-15(c).

129.   Haw. Rev. Stat. § 92F-14 contains an exception for unwarranted invasions of privacy, and Haw. Rev. Stat. § 92F-14(b)(2) contains a specific exception for "[i]nformation identifiable as part of an investigation into a possible violation of criminal law, except to the extent that disclosure is necessary to prosecute the violation or to continue the investigation[.]" *Id.* However, Haw. Rev. Stat. § 92F-14(a) provides that if the public interest in disclosure outweighs the privacy interests of the individual, then disclosure of government records will not constitute a "clearly unwarranted invasion of privacy." *Id.* "While public employees' personnel record might contain 'highly personal and intimate information,' the contents of those records that relate[] to misconduct [do] not implicate the constitution." *State Org. of Police Officers v. City & Cty. of Honolulu*, 149 Hawai'i 492, 512, 494 P.3d 1225, 1245 (2021) (citation omitted). Thus, "particular information related to employee misconduct resulting in suspension or discharge does not enjoy a significant privacy interest." *Id.* at 50, 494 P.3d at 1237 (citing Haw. Rv. Stat. § 92F-14(b)(4)(B)).

130.   Various media outlets reported the termination or suspension of DPP employees implicated in the public corruption scandal. DPP was not allowed

to withhold disclosure of documents on the basis of privacy interests where the information related to employee conduct resulted in suspension or discharge.

131.   Haw. Rev. Stat. § 92F-22-(4) exempts from disclosure information "including investigative reports and materials related to an upcoming, ongoing, or pending civil or criminal action or administrative proceeding against the individual." However, this section does not provide a global exemption over all documents pertaining to the individual, but only to "investigative reports and materials." *See id.* It does not exempt, for example, communications with third parties that are unrelated to the legal proceedings or which are ordinary business records. Even if some portions of the documents withheld by DPP fall within this exception, the remaining documents should have been produced.

132.   Haw. Rev. Stat. § 92F-13(3) states that a government agency need not disclose government records if doing so would frustrate a legitimate government function. However, a denial pursuant to this section must define the legitimate government function that would be frustrated by a record's disclosure "with a degree of specificity sufficient for a reviewing court to evaluate the legitimacy of the contemplated function." *Peer News LLC v. City & Cty. of Honolulu*, 143 Hawaiʻi 472, 487, 431 P.3d 1245, 1260 (2018). "[A]n agency must articulate a real connection between the disclosure of the particular record it is seeking to withhold and the likely frustration of a significant government function."

Haw. rev. Stat. § 92F-13(3). The denial of the request because DPP was "conducting a personnel investigation" does not meet this standard.

133.   At the time of the request, two of the subject employees were still employed by DPP. WAYNE INOUYE and JENNIE JAVONILLO were reported as being "former employees" of DPP; KANANI PADEKEN had been convicted and terminated; and WILLIAM WONG was an architect and not an employee of DPP. Even if there was a personnel investigation for the two remaining employees, JOCELYN GODOY and JASON DADEZ, it was improper for DPP to deny the request as to the other individuals on the basis of a "personnel investigation" that had already concluded for these individuals or a "personnel investigation" of a non-employee.

134.   With respect to category 5, the Notice did not refer to any permissible statutory exception but instead simply stated that DPP "only responds to specific record requests from a requester, not requests relating to requests from other requestors." There is no statutory or other exception to disclosure of "requests from other requestors" and therefore the category 5 documents should have been disclosed. *See* Haw. Rev. Stat. § 92F-11(a).

135.   An actual controversy exists between Plaintiffs and DPP, or antagonistic claims are present between Plaintiffs and DPP, which indicate imminent and inevitable litigation.

136.    A declaratory judgment will serve to terminate the uncertainty or controversy.

137.    Plaintiffs are entitled to a declaratory judgment that DPP violated Haw. Rev. Stat. ch. 92F by wrongfully withholding documents and information that were otherwise required to be disclosed, and an order compelling DPP's disclosure of the information and records in response to Plaintiffs' UIPA request that are not otherwise protected from disclosure by applicable law.

138.    If Plaintiffs prevail on this claim, Plaintiffs are also entitled to an award of reasonable attorneys' fees and costs pursuant to Haw. Rev. Stat. § 92F-15(d).

**[COUNTS VIII–X WERE PREVIOUSLY DISMISSED]**

**COUNT XI:**
**VIOLATION OF CIVIL RIGHTS UNDER 42 USC § 1983**

139.    Plaintiffs incorporate by reference each of the allegations in all previous paragraphs.

140.    Pursuant to 42 U.S.C. § 1983, it is unlawful for the Defendants to violate Plaintiff's civil rights: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress." *Id.*

141.    Defendants have violated Plaintiffs' constitutional rights by preventing Plaintiffs from subdividing and using their property for lawful agricultural purposes.

142.    By their actions, including the actions described above, Defendants have violated Plaintiffs' constitutional property rights, substantive and procedural due process rights, and rights to equal protection under the law, and are liable to Plaintiffs for such violations in an amount to be proven at trial, plus attorneys' fees, expert witness fees, and costs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that judgment be entered in favor of Plaintiffs and against Defendants on all counts of this Complaint and for the following relief:

A.    Appropriate declaratory relief regarding the unlawful and unconstitutional acts and omissions of the Defendants, as set forth above;

B.    Mandatory and injunctive relief regarding the unlawful and unconstitutional acts and omissions of the Defendants, as set forth above;

C.    Just compensation for the taking of Plaintiffs' real property interests;

D.    An award of damages in an amount to be determined at trial;

E.    An award of Plaintiffs' reasonable attorneys' fees and costs;

F.     Other appropriate declaratory and equitable relief; and

G.     Such other and further relief as this court may deem appropriate,

equitable, and just.

DATED:  Honolulu, Hawaii, June 26, 2024.

DAMON KEY LEONG KUPCHAK HASTERT

*/s/ Ross Uehara-Tilton*

_____

GREGORY W. KUGLE
ROSS UEHARA-TILTON
DAVID H. ABITBOL

Attorneys for Plaintiffs